228 So.2d 586 (1969)
ODEN CONSTRUCTION COMPANY
v.
Mrs. Frankie McPHAIL et al.
No. 45440.
Supreme Court of Mississippi.
November 24, 1969.
Rehearing Denied December 22, 1969.
Dudley W. Conner, Hattiesburg, for appellant.
Heidelberg, Sutherland & McKenzie, Hattiesburg, Watkins & Eager, James A. Becker, Elizabeth Hulen, Jackson, for appellees.
SMITH Justice.
Mrs. Frankie McPhail, Brenda Carol McPhail and Kristy Lea McPhail, the widow and minor children of James McPhail, deceased, who are appellees here, were plaintiffs in the court below in an action for damages for his wrongful death, brought against appellant, Oden Construction Company, a Mississippi corporation, under Mississippi Code 1942 Annotated section 1453 (1956). The case was tried and the issues submitted to a jury which returned a verdict for plaintiffs-appellees in the sum of $100,000. The present appeal is by Oden Construction Company from the judgment entered pursuant to that verdict.
The facts supporting the jury's verdict, may be summarized as follows. Oden Construction Company contracted with Main Street Baptist Church of Hattiesburg to construct an auditorium and certain additions to its church building. A subcontract was let by Oden to Howell Steel Company, under the terms of which the latter firm undertook to supply and erect the structural steel and joists as called for in the prime contract. The subcontract contained a restrictive clause providing that Howell would not "sublet, assign or transfer any part of this subcontract without prior approval of (Oden) the contractor."
Notwithstanding this clause, Howell made an oral arrangement with Capital Erection and Engineering Company, Inc., to install the structural steel beams which Howell would supply.
James McPhail was an employee and vice president of Capital.
Prior to McPhail's injury, he and other employees of Capital had been on the job, engaged in erecting steel, for several *587 months. It is beyond question that, while there had been no formal consent or approval, Oden was fully aware that the steel beams were being installed by Capital and knowingly acquiesced in, or tacitly consented to, this departure by Howell from the provisions of the subcontract. There was evidence too that Oden knew that Howell customarily used Capital to erect steel, and knew that Howell's practice, under circumstances such as those in the present case, was to supply the steel and to associate Capital to erect it. There was also testimony that both before and at the time of the negotiations between Oden and Howell, which culminated in the subcontract with Howell, Oden was informed of this arrangement. In any event, no objection was made by Oden either to Howell or Capital, that Capital was doing this work at any time during the months which preceded McPhail's death.
On February 10, 1967, McPhail received the injury, which subsequently caused his death, when a wooden scaffold, constructed by Oden, collapsed and he fell 16 feet to the concrete floor.
As already noted, Oden had sublet to Howell that portion of its contract requiring that it supply and install certain steel beams. Under Howell's arrangement with Capital, Howell supplied the beams and Capital installed them. However, it was necessary, and a part of the procedure adopted by Oden, that holes be bored in the masonry walls in advance for the attachment of the beams by Capital's employees. The boring of these holes was done by Oden's employees, working ahead of Capital's employees, who followed along behind them and attached the steel, both doing their work from the same scaffolding. The evidence was ample to support a finding that this practice, in the nature of an assembly-line operation, not only was known to, but had been adopted by, Oden. It was also in evidence that this method had been used earlier when beams were installed elsewhere in the building. It was not abandoned, but was continued, after McPhail had sustained his injury.
On the afternoon or evening of the day preceding McPhail's injury, Oden's employees had been kept overtime to drill the holes necessary for the attachment of the steel beams by Capital's employees in a back corridor of the building. This was done by Oden in order that the work of installing the beams would not be delayed but might go forward immediately the next day.
The scaffolding from which this work was done was constructed by Oden. It was 16 feet high, 4 feet in width, 40 to 45 feet in length, and completely filled the corridor in which the work was being done from wall to wall. There was, of course, no room in the corridor for other scaffolding, and no alternative reasonable method has been suggested whereby Capital's employees could have done the work except by the use of the scaffold.
When McPhail stepped upon the scaffold, it gave way as certain nails pulled loose and he fell 16 feet to the floor, breaking his hip. There was testimony tending to show that the method used by Oden to construct the scaffolding rendered it unsafe as a place to work and that its collapse was due to faulty construction. On the other hand, Oden contended that its collapse was due to a concentration of weight by the "piling" of steel beams upon it in one place by Capital's employees, an eventuality, it is argued, that Oden could not reasonably have anticipated or foreseen. Testimony supporting this contention was rebutted by evidence that there had been no such piling or concentration of steel. The jury resolved this factual issue in favor of appellees.
Undisputed medical evidence in the record is to the effect that, following what appeared to be satisfactory progress toward recovery from his injury, McPhail had died 7 days afterward from a pulmonary embolism originating at the site of the hip fracture.
*588 The main thrust of appellant's argument for reversal is predicated upon the premise that, by the express terms of the written subcontract between Oden and Howell, Oden owed no duty to McPhail as an employee of Capital as (1) Oden had never authorized Howell to sublet to Capital the work of attaching the beams and (2) the express provisions of the subcontract required Howell to supply or furnish its own tools and facilities for doing the work contemplated by the subcontract.
In Raich v. Aldon Construction Co., 129 Cal. App.2d 278, 285, 276 P.2d 822, 827-828 (1954) the Court said:
"The general rule is that a general contractor on a construction job who is in control of the premises is burdened with the duty to use ordinary care to provide a safe place for employees of a subcontractor to work, * * *."
"As a part of supervising the work, it is the duty of the general contractor to oversee conditions in the work of each subcontractor so far as they affect the safety of the employees of the subcontractor."
In 65 C.J.S. Negligence § 70 (1966) the rule is stated thus:
A person undertaking to furnish machinery or appliances for the use of others ordinarily assumes a duty to furnish proper and safe appliances, and, as is discussed infra §§ 98, 99, he may be liable to one lawfully using such machinery or appliances who is injured because of his failure to exercise proper diligence in this respect, even where the person using the appliance, or his employer, does not receive the appliance directly from the person furnishing it, since the liability rests not on a contractual relation between the person injured and the person whose negligence caused the injury, but on the failure to perform a duty assumed by one, which results in injury to another. (Emphasis added.)
Chapter 14 of Restatement of Torts (Second) sections 388-408 (1965) deals with "liability of persons supplying chattels for the use of others." Section 392 contains the following language:
One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied
(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
(b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.
Section 329, Comment f. of the same work contains the following statement:
f. In order that a chattel shall be supplied for another to use for a business purpose of the supplier, it is not essential that its use is necessary for the performance of a contract between a supplier and a third person. It is enough that the chattel is to be used in furtherance of any business purpose of the supplier.
Illustration:
4. A, contractor, for the purpose of obtaining information necessary to enable him to bid on the repair of a building, erects a scaffold so as to inspect the condition of the cornices and roofing. He permits a subcontractor, upon whose bid for the mason work the contractor's bid will depend, to use the scaffold. An employee of the subcontractor going upon the scaffold in pursuance of this arrangement for the purpose of inspecting the cornice is using *589 the scaffold for the contractor's business purposes. (Emphasis added.)
In Meny v. Carlson, 6 N.J. 82, 89-95, 77 A.2d 245, 248-252, 22 A.L.R.2d 1160, 1168-1172 (1950), the Court dealt with a factual situation where work was being done on a building by a general contractor and several subcontractors. The work of the subcontractors was, to some extent, overlapping. Scaffolding was necessarily used by carpenters, roofers and tinsmiths. It was unrealistic for each subcontractor to erect his own scaffolding. The carpentry subcontractor erected the scaffolding and by express or implied permission supplied it for the use of other subcontractors and their employees. An employee of the roofing subcontractor fell because a bracket on the scaffold became disengaged.
The Court said:
An inference is thus created that this defendant contemplated the use of the scaffold by the plaintiff. There was testimony that in construction work, of the nature here involved, cooperation among the various trades is customary. * * * There was testimony that Hazekamp knew that the plaintiff and the other roofers, as well as the tinsmiths, were using the scaffold; * * and that another part of the scaffold on the same building was still being used by the carpenters at the time the plaintiff was working on the part of the scaffold which collapsed. There was sufficient evidence to justify an inference that Hazekamp had control of the facilities used by the carpenters under his jurisdiction and apparent authority to authorize the use of such facilities by the plaintiff. * * *
A review of the evidence convinces us that whether or not the plaintiff was an invitee of the defendant, Busman and Rosen, Inc.; and if an invitee, whether this status arose through an implied or an express invitation; whether this defendant placed Hazekamp in a position of apparent authority to extend an express invitation to use the scaffold; whether an express invitation was actually extended pursuant thereto; and whether the plaintiff was justified in relying thereon, were all questions properly submitted to the jury.
* * * * * *
[M]ere use of the scaffold by the plaintiff would not as a matter of law divest this defendant of its control of the scaffold. Ownership of the scaffold, erection of the scaffold, and the properly inferrable invitation by this defendant to the plaintiff to use the scaffold created an inference from which the jury could justifiably determine that the scaffold was under the control of this defendant. The fact that the jury determined that both this defendant and the Carlson Company were in control of the scaffold creates no inconsistency.
The Court, in discussing the liability of the general contractor, said:
The plaintiff, as an employee of a subcontractor, was on the premises by the implied invitation of the defendant, Carlson Company, the general contractor, which was bound to use reasonable care to see that the place in which the work was to be performed was reasonably safe. * * *
A careful review of the record has convinced us that, while the evidence is not without conflict, it was sufficient to support the jury's verdict for the plaintiffs.
Oden, under the terms of the subcontract, might have declined to allow Howell to subcontract with Capital to install the beams and, upon the same basis, might have insisted that Howell provide and work from its own scaffolding. Oden did neither of these things. It is clear that everything done in the premises was with the knowledge and tacit consent of Oden, whose employees were engaged with Capital in installing the beams, Oden's men boring the holes used by *590 Capital's employees to bolt the steel to the walls. Moreover, the jury was fully warranted in concluding that Oden built the scaffold with the knowledge and expectation that it would be used by Capital for doing this work. It would be unreasonable to suppose that Oden had kept his men overtime to bore the holes so that the work of attaching the beams would go forward at once the next day and not have contemplated the use for that purpose of scaffolding, already in place, which completely filled the entire hallway.
Appellant contends that 5 of the 8 instructions granted at appellees' request erroneously stated the law. These instructions embodied the theory of negligence upon which appellees predicated their case. The 16 instructions granted appellant amply covered, in detail, the principles relied upon by the defense. The trial court refused to grant only one instruction requested by appellant, that one having been a peremptory instruction directing the jury to find for defendant-appellant.
After careful consideration of each of the several criticisms directed at the instructions granted appellees, we have concluded that none is well taken. These instructions are not misleading, together contain a correct statement of principles relied upon by appellees, and there was evidence capable of supporting appellees' contentions with respect to the facts of the case. More than this, when read and considered with instructions granted appellant, wherein appellant's defenses were adequately pointed out to the jury, it is apparent that the issues in the case were fairly submitted to the jury for determination. We find no prejudicial error in the instructions.
Appellant assigns and argues, as having prejudiced the jury against it, certain statements made by appellees' counsel in the voir dire examination of prospective jurors.
In Curry & Turner Construction Co., Inc. et al. v. Bryan, 184 Miss. 44, 185 So. 256 (1939) it was held that reasonable latitude should be allowed counsel in questioning prospective jurors. The present record reveals that, from time to time, objections were interposed by appellant to questions propounded by appellees' counsel on the voir dire examination. Many of these were sustained by the trial judge, who followed his rulings with appropriate admonitions to the jurors. We are unable to say from the record that anything occurred in the course of this examination capable of prejudicing appellant's right to a fair and impartial jury.
Finally, complaint is made of the size of the verdict, it being argued that it is so excessive as to evince passion or prejudice on the part of the jury which returned it.
At the time of his death, McPhail was 41 years of age, with a life expectancy of 31.29 years. He left surviving him a widow and two young children who were dependent upon him, the youngest of the children having been born on December 8, 1966. He earned $200 per week. Following his injury he lived approximately a week and suffered some pain. There were "special" damages amounting to $2,039.75.
The suit was brought under Mississippi Code 1942 Annotated section 1453 (1956). This statute contemplates the recovery in one action of all damages of every kind, both to the decedent and to the survivors.
Such damages include loss of support, as well as of association, society and companionship by his widow and young children, together with the value of decedent's life. Under all of the circumstances in this case it is impossible for this Court to say that the verdict returned by the jury was so excessive as to indicate that it was the result of passion or prejudice.
Other assignments of error have been considered and are without merit.
The record in this case reflects that, although contested with the utmost vigor *591 at every stage of the proceedings, it was well and fairly tried. We find no prejudicial error in the record and the verdict and judgment appealed from must be affirmed.
Affirmed.
GILLESPIE, P.J., and PATTERSON, INZER and ROBERTSON, JJ., concur.